260 S.E.2d 204 (1979)
Joseph H. CAMPBELL, etc.
v.
BOARD OF TRUSTEES OF the JAMES BARRY-ROBINSON HOME FOR BOYS.
John Joseph BAECHER
v.
T. David FITZGIBBON, James J. Gara, H. Thomas Grissom, Jr., and Edward V. Power, Trustees, etc.
Record Nos. 771712, 771713.
Supreme Court of Virginia.
November 21, 1979.
*205 Alan J. Hofheimer, Thomas F. McPhaul, Norfolk (Hofheimer, Nusbaum & McPhaul, Norfolk, on briefs), for appellant in No. 771712.
Robert Wayne Nunnally, Norfolk, for appellant in No. 771713.
Thomas H. Willcox, Jr., Norfolk (James C. Howell; Willcox, Savage, Lawrence, Dickson & Spindle, P.C., Norfolk, on brief), for appellees in both cases.
Before I'ANSON, C. J., and CARRICO, HARRISON, COCHRAN, HARMAN, POFF and COMPTON, JJ.
HARRISON, Justice.
These cases involve the construction of a clause in the will of Frederick J. Robinson which created "a Home and School of Arts and Trades for Orphan Boys."[1] The trustees *206 under the will, in their most recent request for aid and direction in administering the trust, sought the court's approval of a plan to cease operation of the James Barry-Robinson High School in Norfolk and to commence the operation of a residential treatment center, directed toward aiding children with educational, emotional, behavioral, or social problems. Joseph H. Campbell, attorney for the Commonwealth, was granted leave to intervene at the relation of several parents of students who were attending the existing high school. John Joseph Baecher, a dissenting trustee, opposed the new program advocated by the other four trustees and also filed a petition in opposition to the relief sought by the majority. While the dispositive issue involves the right of the trustees to establish a residential treatment center, Baecher also questions the action of the trustees in forming a corporation to operate the treatment center and their action in amending the bylaws and removing Baecher as the Secretary-Treasurer of the James Barry-Robinson Home for Boys. From decrees of the court below, resolving all issues favorably to the trustees, Campbell and Baecher noted appeals which are treated here as a consolidated cause.
Frederick J. Robinson died testate on January 11, 1924, and his residuary estate, then in excess of $1 million,[2] passed in trust, the purpose of which was to fund and maintain a home and school for orphan boys of the Catholic faith between the ages of seven and fifteen years. The will specified that its purpose was to educate and teach the boys "the grammar and academic grades of study and certain trades," and that no one be admitted "unless he or his parents shall have resided in the City of Norfolk, or its immediate vicinity for at least five years previous to such admission.. . ." Notwithstanding these provisions, the will also directed the trustees to admit other boys of like residence and ages, and of other faiths, as day scholars or as residents, if at any time the number of orphan boys from the Norfolk area was not sufficient to fill the home. The trustees were given wide discretion and were vested with "the superintendance, supervision and general management of said Institution and Home."
The trustees established and dedicated the James Barry-Robinson Home for Boys in late 1933. The facility was opened on January 1, 1934, with an original enrollment of eight boys, one of whom was Catholic, and few, if any, of whom were orphans. Residents of Barry initially received a junior high school education, complemented with vocational training in craft shops located on the grounds. The primary source of children was the St. Vincent's Home in Roanoke. The emphasis at the outset, consistent with the testator's intent, was on the home, with the school serving as an adjunct thereto. Barry was operated by the Benedictine Fathers under a contract between the trustees and the Benedictine Society of Westmoreland County, Pa., a corporation. Under the Benedictines the primary emphasis was upon discipline and agricultural training, rather than upon education.
In 1960, the Circuit Court of the City of Norfolk granted the trustees permission to conduct a high school and, notwithstanding the provisions of the will, to permit boys who entered the home prior to their fifteenth birthday to complete their high school education. Grade seven was dropped from the curriculum, and grade eleven was *207 added at that time. During the following year grade eight was dropped, and grade twelve was added. In 1962, the high school held its first graduation ceremony.
The Benedictine Fathers instituted the high school program, but Barry never attained accreditation during their tenure. In 1967, certain problems developed, and the Benedictines ceased their operation. At that time the trustees entered into an agreement with the Bishop of the Richmond Diocese and the Franciscan Fathers to operate the institution. The court approved this agreement with the admonition that the trustees seek to achieve a fully accredited institution, and this was ultimately accomplished in May 1976.
During the tenure of the Franciscan Fathers, Barry was conducted as a conventional high school. Classes were small, and the students received a good secondary education. Barry was described as "simply a prep school for upper middle-class children basically." Father Bonaventure Midili, headmaster of Barry during the last five years of its existence, was quoted in Metro, a Norfolk area magazine, as describing Barry-Robinson in 1973 as a private high school based on Christian principles and "best suited to be a school for the average boy of average intelligence with average money." Barry had more students entering college than any other high school in the diocese. The tuition during this period ranged from $200 to $765, and the cost of educating a child at Barry rose to $3,000. Father Midili testified that Barry actively recruited boys and had hired a social worker to contact social agencies but had met with little success. Although the home was capable of housing twenty students, only five students were residents. The school had an enrollment of ninety-three students. Father Midili said that preference was not given to Catholics or orphans and that the residency and age requirements set forth in the Robinson will were generally ignored. Although the school did not admit boys with serious emotional problems, it did accept boys who were "mildly disturbed" or who had "adjustment problems" that the school felt it could handle with its staff.
The inability of Barry to admit orphans resulted from the dramatic decrease in the number of orphans in our society. The orphan population in the United States, which was approximately 750,000 in 1919, had decreased to less than 25,000 by 1969. During this era many orphanages across the nation, including three orphanages in the City of Norfolk, ceased operation because of a lack of qualified students. Out of a student body of ninety-eight at Barry during its last year of operation, a maximum of thirteen students had no father or had come from broken homes, and there was no evidence that any student was an orphan. The decline in the orphan population is attributed to many factors: better medical care, longer life-span, foster homes, adoptions, and federal, state, and local programs designed to aid dependent children.
In February 1965, Father Paul T. Gaughan, Executive Director of the Catholic Family and Children's Service, expressed his concern, in a written proposal to the board, that the institution was becoming increasingly oriented to providing private school education for middle and upper class families and recommended a program not unlike that which was ultimately adopted by the trustees and is presently under attack. Father Gaughan also recommended that a consultant be employed. The board of trustees shared Father Gaughan's concern and in 1975 commissioned Robert Lawrence, Deputy Director of the Health, Welfare, and Recreation Planning Council, to conduct a study. The study was primarily directed to the intent of the Robinson will and to the community needs, especially the needs of children who, for whatever reason, were unable to remain in their natural home and receive the guidance and training necessary to meet their physical, mental, emotional, and social needs at the various stages in their development.
The Lawrence report documented the declining need in this country for orphanages and suggested that, because most orphans were cared for in foster homes, the need for institutional care had shifted from long-term *208 custody of homeless children to short-term treatment of children with adjustment problems. The report, after suggesting several alternatives[3] for changing the direction of Barry-Robinson to better serve the needs of young boys and the community, concluded that the best use would be the development of a residential treatment facility oriented to providing services to dependent and neglected children as well as those judged to be delinquency-prone.
The board of trustees initially reacted to the report by moving Barry-Robinson in this new direction while still attempting to salvage the existing high school. However, by March 1976, a majority of the trustees had decided that it was impossible to do both and that the residential treatment center should be established. Accordingly, the board created a nonstock, nonprofit corporation, known as the James Barry-Robinson Institute, and contracted with the Institute to operate and administer the center. The trustees of the Institute are the same individuals as the trustees administering the Robinson trust.
Since the Franciscans were admittedly not qualified to inaugurate and operate the Institute, a new staff, headed by Sister Anne Mullin, was employed to develop the treatment center program. Sister Mullin testified that her mission as Executive Director of the Institute was "to develop a program for boys who are in need of separation from their home because of educational problems, psychological problems, social problems, emotional problems." She emphasized that the Institute would not be a mere custodial institution or a detention home. Sister Mullin testified that the center would initially begin operation with twelve resident boys and eight day students and that its maximum population would not exceed forty, thirty of whom would be residents. This restrictive enrollment was the result primarily of physical plant limitations and state government regulations. She said the center would be recognized and licensed as a special education school by the State Department of Education and teachers would be accredited. The state would also require a child care license, the same license required under the Franciscans and Benedictines. Sister Mullin stated that trade and remedial courses would be taught. However, she emphasized that the curriculum would not be entirely remedial but would be designed to accommodate each student's particular situation. Arrangements would be made for credits to be transferred to the public schools. The boys admitted to the center would remain six to eighteen months for treatment and then be returned to their public school environment.
Some persons who oppose the closing of the Barry-Robinson School and the establishment of the treatment facility refer to the Institute as a detention home and regard it as a quasi-reform school. The testimony does not substantiate this charge. The children being admitted to the center range in age from twelve to fifteen years and have a minimum IQ of eighty, whereas the former policy of Barry-Robinson was to take children with at least an IQ of eighty-five. The objective of the treatment facility is to treat, train, and educate these children so they can function again within the public school system.
*209 Although many feel strongly that the treatment facility should not be inaugurated or that the Barry-Robinson School for Boys should continue in operation in conjunction with the facility, the trustees considered these alternatives and rejected both. Their decision is supported by the testimony of a number of witnesses that the operation of a high school and a treatment facility would be inconsistent, uneconomical, and educationally unsound. Father Midili said that the admission of children with serious problems to the treatment center would not constitute "a good mix" with the high school.
Although the Barry-Robinson High School was a good school and had been operated properly by the Franciscans, the trustees reasonably concluded that there was little need in the Norfolk area for a ninety-student high school. Norfolk Catholic, with an enrollment of approximately 720 students, had eighty vacancies at the time of the trial. The educational needs of boys between the ages of twelve and fifteen are being adequately served by the existing private, parochial, and public schools in the Norfolk area. The trustees and a number of other witnesses are convinced that the area is more in need of a child treatment facility than another high school.
The only issue is whether the trustees had the authority to discontinue the high school that they were operating and to create a corporation to operate and administer a residential treatment center. The trustees concluded that they did have such authority and that such action would fulfill both the intent of the testator and the best interest of the trust and of the community. The trial court, under whose direction and guidance the Robinson trust has been administered since its inception, concurred. We cannot find from the record before us that its judgment is not supported by the evidence or that it is plainly wrong.
It is apparent that Mr. Robinson desired the bulk of his estate to be used to care for, educate, and meet the needs of very young, disadvantaged boys who were without a home and without parental guidance. At the time of his death the boys who were most likely to be in the greatest need of a home, shelter, and an education were orphans. The testator therefore provided for both a home and a school designed to satisfy the physical, emotional, and educational needs of young boys. Because few boys now meet the religious, residency, and orphan requirements specified in the will, and because the entity originally designed as a home and school for orphans evolved into a private preparatory school, the trustees sought an alternative way to carry out the intention of the testator as nearly as possible. This is the rule of cy pres, a term well defined in Black's Law Dictionary 349 (5th ed.1979), as follows:
Equitable power which makes it possible for court to carry out testamentary trust established for particular charitable purpose if testator has expressed general charitable intent, and for some reason his purpose cannot be accomplished in manner specified in the will. In re Gatlin's Estate, 16 Cal.App.3d 644, 94 Cal.Rptr. 295, 296.
Thomas v. Bryant, 185 Va. 845, 40 S.E.2d 487 (1946), involved the sufficiency of a fund designated to establish and maintain a trust created by a testator for the purpose of building and maintaining a home for "destitute and dependent aged white people." The court said:
It is clear . . . that it will not be possible, with the available funds, to establish and maintain on a large scale a home for the care of the "destitute and dependent aged white people, both men and women, . . ." But it is, we think, by no means clear that the fund will be insufficient to care for a small number of such people. Indeed, we think the preponderance of the evidence shows that this can be done, . . .
* * * * * *
In the case before us the testator desired that this fund be used for a worthy charitable purpose. It is clear that he did not intend that his heirs should receive it. While the income from the fund may not *210 be sufficient to maintain and establish a home on the scale of some other institutions of like character, there is no reason why it should not be applied as far as is practicable to carry out the testator's intent. Surely, the fact that the fund may not be adequate to provide for the needs of all of the indigent aged of Wythe county is no reason why it should be taken from the small number who may be aided thereby and turned over to the heirs, contrary to the intent of the testator.
185 Va. at 852-53, 40 S.E.2d at 490. See also McClure v. Carter, 202 Va. 191, 116 S.E.2d 260 (1960).
During the pendency of Thomas v. Bryant, supra, the General Assembly of Virginia enacted what is commonly known as the state's "Cy Pres Statute", Code § 55-31. The statute provides, in pertinent part:
When any . . . person gives, bequeaths,. . . any . . . property in trust to or for any educational, charitable or eleemosynary purpose, the indefiniteness or uncertainty of the beneficiaries named in any instrument creating such a gift, bequest, . . . or the indefiniteness of the purpose of the trust itself, shall not defeat any such trust and,. . . it shall be administered to conform as near as may be to the purpose for which created or, if impossible of performance for this purpose, for some other educational, charitable, benevolent or eleemosynary purpose. . . .
Smith v. Moore, 343 F.2d 594 (4th Cir. 1965), involved the validity of a testamentary trust created for the erection and maintenance of a free hospital. The trust contained provisions directing that not more than one-fifth of the testator's estate be used in acquiring a physical plant. It was held that the trust did not fail merely because a specified percentage of the estate was insufficient for acquisition of the physical plant and that the trust would be effectuated, under a doctrine of equitable approximation. In doing so the court relied strongly upon Thomas v. Bryant, supra, which it regarded as dispositive, and noted:
The Supreme Court of Appeals of Virginia has been in the forefront in giving broad scope to application of the doctrine of equitable approximation to charitable trusts. It has not limited the power merely to permitting minor variations in administration of trusts, but has utilized the doctrine to validate a testamentary trust which would have been impossible of performance at the time of its inception because of an insufficiency of funds to comply literally with the strict terms of the trust instrument, had literal compliance been deemed mandatory.
343 F.2d at 602.
In Loats Female Orph. Asylum v. Essom, 220 Md. 11, 150 A.2d 742 (1959), those charged with the operation of a female orphanage confronted the same problem that confronts the trustees of Barry-Robinson. Due to the lack of orphans it was necessary to close the orphanage which was established by a testator who had left real estate for its funding. The property was sold and the proceeds applied to the aid of destitute and deserving female orphans. In approving this action the court noted the decrease in the number of orphans in the United States and the current preference for placing orphans in foster homes and reserving the use of institutions for children with "special problems."
Although the testator clearly intended an irrevocable and complete charitable gift, the trustees have never been able to comply strictly with the specific directions of the testator's will since the creation of the Robinson trust. The principle of cy pres, however, pursuant to Virginia Code § 55-31, has permitted the trustees, with the approval of the supervisory court, to effectuate the charitable purpose of the testator as nearly as possible. Merely because they and the lower court once considered the operation of a high school as a proper compliance with the provisions of the trust does not bar the trustees from now adopting another policy which they and the court believe will more nearly comport with the intent of the Robinson will.
*211 Altered circumstances and new theories of meeting the needs of young children who need treatment dictate the change made by the trustees administering the trust under the Robinson will. It is not a departure in principle from the objectives of the will. The testator reached out to help young boys who were without a home or parents. The trustees under his will are seeking to help young boys who need the special care, training, and education which they cannot obtain in their homes or in local schools, and which can be provided in a residential treatment center.
We find no merit in the assignment of error which questions the action of the trustees in creating the James Barry-Robinson Institute to administer the treatment center. For obvious reasons the trustees, in the administration of the Robinson trust, must contract with others to operate any facility they establish. In the past the board contracted with the Benedictines and the Franciscans, both corporate entities, to operate the Barry-Robinson School. The Institute was created to facilitate the acquisition of governmental funds and to shield the trustees from the various commitments and liabilities involved in public funding entailed in the financing of the Institute. Clearly, the trustees had the authority to create the corporation and to contract with it. The concern of Mr. Baecher over the possible transfer of trust assets to the Institute is unfounded. The decree of the lower court specifically prohibits such a transfer.
The adoption of the new program by the trustees, resulting in the closing of the Barry-Robinson School and the establishment of a treatment center, was done over the objection of Baecher, who cast the only dissenting vote. His opposition continued after the trustees' final decision, to such an extent that as Secretary-Treasurer of Barry-Robinson he refused to sign checks authorized by the board and payable to the Institute. He also refused to participate in the activities of the Institute as a director or otherwise. Because his actions and continued opposition frustrated and impeded the trustees in establishing the Institute and in inaugurating its program, the trustees decided to remove Baecher as Secretary-Treasurer of the James Barry-Robinson Home for Boys. Accordingly, at a meeting of the trustees held on September 15, 1977, they voted three for, one against, with one abstention to remove Baecher from office and elected a new Secretary and a new Treasurer to replace him. After taking this action the board realized that it had not complied with a bylaws provision requiring a four-fifths vote of the trustees to remove an officer. A week later, at a special meeting, the board adopted a new set of bylaws under which the approval of three trustees was required for the removal of an officer. Following the adoption of the new bylaws, the board resolved that Baecher's position as Secretary-Treasurer of the Barry-Robinson Home be terminated, effective immediately. The vote was again three for, one against, with one abstention. Baecher was present, participated in the meetings held on September 15th and September 22nd, and expressed his opposition to the trustees' action.
Baecher suggests that he was elected to serve permanently as Secretary-Treasurer of the board of trustees in 1949; that his election was in the nature of a contractual obligation of the board; and that he could be removed from office only if a vacancy occurred by reason of his death, resignation, or retirement, or if just cause existed for his removal. He also notes that the other trustees induced him to accept the position and that he had resigned from a well-established position to take the job.
While the position of Secretary-Treasurer of the Barry-Robinson Home was created as a permanent position, we find nothing in the bylaws or elsewhere to indicate that Baecher was employed as the permanent Secretary-Treasurer of the corporation until death or resignation, or that he had any vested right to the position. Assuming, but not deciding, that his conduct did not constitute cause for the termination of his services, the fact remains that the supervision, management, and control of the trust and of the Barry-Robinson Home is vested *212 in the five trustees, and as such they have the responsibility to select, employ, and discharge their employees. Clearly, their action in amending the bylaws under which they operate, and in terminating Baecher's employment, accorded with the amendment bylaws. Both actions were matters within their discretion.
We find no error in the decrees entered in the lower court, and accordingly they are
Affirmed.
NOTES
[1] The clause in question is paragraph 11 of the will which reads as follows:

ELEVENTH: I hereby give, grant, devise and bequeath my entire residuary estate, real, personal and mixed, of every nature, kind and description whatsoever and wheresoever situated and being, to a Board of Five Trustees to be hereinafter designated, who are to hold the same IN TRUST, however, for the following uses and purposes, namely: FIRST: to use and apply so much of my said residuary estate as in the judgment of the said Board may be necessary to found, establish, erect and equip in the City of Norfolk, Virginia, or its immediate vicinity, a Home and School of Arts and Trades for Orphan Boys to be admitted between the ages of seven and fifteen years, which said Home and School shall be known as the "JAMES BARRY-ROBINSON HOME FOR BOYS," and the same shall be maintained and operated for the purpose of educating orphan boys of the Catholic Faith and teaching them the grammar and academic grades of study and certain trades that shall be installed in said institution, but nothing herein contained shall be construed as preventing orphan boys of other faiths and religious beliefs from entering the said Home and School, provided they comply with the rules and regulations prescribed by those in charge of the said institution, and provided also that no one shall be admitted to said institution unless he or his parents shall have resided in the City of Norfolk, or its immediate vicinity for at least five years previous to such admission, but if at any time the number of such orphan boys is not sufficient to fill said Home and Institution, then in such event, the said Board of Trustees are hereby authorized and empowered to admit thereto such number of other boys of like residence and ages as day scholars or otherwise, and also other orphan boys of like ages of the State of Virginia, who shall have been residents of said State for at least five years previous to such admission, as in the judgment of the said Board can be accommodated by said Institution and Home. It is my desire and I direct that no restrictions be placed upon the numbers and kinds of studies and trades to be taught in said institution; may trustees, however, shall be the judges of the numbers and kinds of studies and trades to be taught, and they are hereby requested and directed to add, from time to time, as many additional studies and trades to the curriculum as the condition of my estate will permit; the superintendance, supervision and general management of said Institution and Home are hereby given to my said trustees. And SECOND: After the founding, erecting and equipping of said Institution and Home as aforesaid, to use and apply the profits and accumulations arising from the balance remaining of my said residuary estate, in maintaining and supporting said Institution and Home and the inmates thereof, and also in making such additions to, and enlarging said Institution and Home as may from time to time be required for the development and growth thereof.
[2] The value of the assets in the trust now exceeds 6.25 million dollars.
[3] (a) Cease functioning as an operating agency and utilize trust funds available to finance services to children provided by other operating agencies;

(b) Continue operating the Barry-Robinson High School for boys, grades 9-12;
(c) Expand the Barry-Robinson School to include grades 7 and 8 to accommodate the boys who would reside in the home and day students and also increase the capacity of the home;
(d) Develop a residential facility and program for the severely emotionally disturbed child;
(e) Develop a residential facility for the physically and multi-handicapped child;
(f) Develop alternative living facilities such as group homes for mentally retarded who are able to live independently with limited assistance or supervision;
(g) Develop a residential facility and supportive educational and treatment programs for the dependent, neglected and/or delinquency-prone child or those adjudicated for minor offenses;
(h) Develop residential training facility for confinement of juvenile delinquents.